IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATRINA STEVENS MARSH TRAPPIER,<br><br>          Plaintiff,<br><br>     v.<br><br>JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>          Defendant. | HONORABLE JEROME B. SIMANDLE<br><br>CIVIL NO. 06-2399<br><br>**OPINION** |

APPEARANCES:

Robert Anthony Petruzzelli, Esq.
JACOBS, SCHWALBE & PETRUZZELLI, PC
Woodcrest Pavilion
Ten Melrose Avenue
Suite 340
Cherry Hill, NJ 08003
     Attorney for Plaintiff

Christopher J. Christie
United States Attorney
     By:  Karen Ortiz, Esq.
          Stephen Patrick Conte, Esq.
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
     Attorneys for Defendant


**SIMANDLE**, District Judge:

     This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g)

(2006), to review the final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying the

application of Plaintiff, Katrina Stevens Marsh Trappier ("Trappier" or "Plaintiff"), for Supplemental Security Income ("SSI") under Title XVI of the Act.  See 42 U.S.C. § 1381a (2006).

Because the ALJ's decision fails to explain why he rejected the findings of two treating physicians who indicated that Plaintiff would be absent from work at least twice per month, which the vocational expert indicated would preclude her substantial gainful employment, the Court shall remand the matter to permit the ALJ to formulate that explanation.

I.    BACKGROUND

A.    Procedural History

In November 1996, Plaintiff filed an application for Disability Insurance Benefits ("DIB") and SSI, alleging an onset of disability beginning August 1, 1991.  (R. at 118, 402.)  That claim was denied on March 10, 1997 and Plaintiff did not request reconsideration. (R. at 118.)

In September 1998, Plaintiff filed the current application for SSI benefits only, again alleging an onset date of August 1, 1991.  Plaintiff claims that she is disabled due to a seizure disorder that affects her ability to concentrate.  Her claim was initially denied on February 10, 1999.  (R. at 56-58.)  Plaintiff filed a request for reconsideration on April 3, 1999. (R. at 61.)  That request was also denied, on July 1, 1999.  (R. at 63.)

2

Plaintiff then requested a hearing by an Administrative Law Judge ("ALJ") (R. at 65) and that hearing was held before ALJ Shoemaker on February 14, 2000 (R. at 396-439).  ALJ Shoemaker denied Plaintiff's application for benefits in a decision dated March 29, 2000. (R. at 40-51.)  On April 4, 2000 Plaintiff sought review by the Appeals Council.  (R. at 86-87.)

On June 27, 2003, the Appeals Council issued an Order vacating ALJ Shoemaker's decision and remanding the case "for resolution of the following issues:" (R. at 53-55)

- The hearing decision indicates the claimant's impairments, in part, preclude her from working in high stress work environments (Finding No. 4). However, the decision does not adequately describe, in specific functional terms, the definition of a high stress work environment.  Social Security Ruling 85-15 indicates that stress is highly individualized and that [determining] whether an individual will be able to adapt to the demands or "stress" of the workplace is often extremely difficult.  Further discussion of the claimant's ability to respond to stress is required.

- The hearing decision indicates that little weight is accorded to the opinion of disability provided by Dr. Bao D. Nguyen because it is inconsistent with the preponderance of the medical evidence of record as well as with his own treatment records.  However, the decision does not adequately reference the evidence that rebuts Dr. Nguyen's opinion.

3

> • The hearing decision relies on the
> framework of Rule 203.29, Table 3,
> Appendix 2, Subpart P, Regulations No.
> 4, to direct a finding of "not
> disabled."  However, the decision
> concludes the claimant experiences
> environmental restrictions, stress-
> related limitations and an inability to
> perform complex, detailed, and technical
> work (Finding No. 4).  In view of the
> nature of these determined work-related
> limitations, vocational expert evidence
> is required to determine whether there
> exists a significant number of other
> jobs in the national economy the
> claimant is able to perform.

(R. at 53-54.)  Accordingly, the Appeals Council Ordered ALJ

Shoemaker to gather additional evidence concerning Plaintiff's

seizure disorder, give additional consideration to Plaintiff's

residual functional capacity, obtain evidence from a vocational

expert and offer Plaintiff another hearing.  (R. at 54.)

ALJ Shoemaker held a second hearing on February 26, 2004 (R.

at 372-95) and issued a second decision denying Plaintiff's

application for SSI benefits on September 17, 2004  (R. at 270-

79).  Plaintiff requested a review by the Appeals Council (R. at

283-84), which again vacated ALJ Shoemaker's decision and

remanded the case back to an ALJ (R. at 280-82).  The Appeals

Council directed the ALJ to resolve the following issue:

> The hearing decision finds that the
> claimant's assertions concerning her
> disability are not credible (Finding #5) and
> that she retains to [sic] residual functional
> capacity work tasks as a sedentary accounts
> payable clerk (Finding #6), but no rationale
> is provided in the decision to support either

4

of these conclusions.  The decision
thoroughly analyzes the competing opinions of
Drs. Nguyen and Campellone, but abruptly
comes to an end on page 6 without evaluating
the claimant's symptoms (including short
attention span, loss of focus and short term
memory loss), setting forth her residual
functional capacity on a function-by-function
basis, or comparing the demands of the past
relevant work to the established residual
functional capacity.  Further evaluation is
necessary.

In addition, the hearing decision is silent
on the claimant's request to reopen the
determination on her earlier application and
to subpoena records from treating physicians.

(R. at 281.)

On remand, ALJ Mark G. Barrett held a hearing on July 15,
2005.  (R. at 320-71.)  He issued a decision on November 21,
2005, denying Plaintiff's claim for benefits. (R. at 16-35.)

ALJ Barrett found that Plaintiff had not engaged in
substantial gainful activity since 1998 and that she has epilepsy
and osteoarthritis of the knees, which are severe impairments
that were not severe enough, however, to meet or equal any of the
impairments listed in the regulations.  (R. at 23-24, 34.)  ALJ
Barrett also found that Plaintiff had the residual functional
capacity to perform a range of sedentary work because she could
lift and carry twenty pounds occasionally and ten pounds
frequently and stand and/or walk for at least two hours and sit
for about six hours in an eight-hour workday, but that she has
postural limitations, which restrict her abilities to balance,

5

stoop, kneel, crouch, crawl and climb, and environmental limitations, which require her to avoid temperature extremes, humidity, noise, vibrations, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights. (R. at 31-32, 34.) He concluded, therefore, that she could not perform her past relevant work as a cashier/checker, but could perform her past relevant work as a receptionist. (R. at 33-35.) Therefore, ALJ Barrett found, at Step Four, that Plaintiff was not disabled or entitled to benefits. (R. at 35.)

Plaintiff filed another request for review with the Appeals Council (R. at 14), which it denied on April 19, 2006 (R. at 8-10). Thus, the November 21, 2005 decision of ALJ Barrett became the final decision of the Commissioner. Plaintiff timely filed this action on May 31, 2006.

### B.   Personal and Medical History

#### 1.   Biographical Facts

Plaintiff is a forty-eight year old woman with two years of community college education and some EMT training. (R. at 331.) She has past relevant work as an accounts payable clerk, a receptionist, and a cashier/checker. (R. at 22.) In 1991, Plaintiff says, she was laid off from her job as an accounts payable clerk around the time her epileptic seizures were worsening. (R. at 334-35.) She has not had gainful employment since.

Plaintiff testified she lives in a three-story row house with fifteen steps, which she has difficulty climbing.  (R. at 330, 344.)  Plaintiff is married and has two children, who at the time were 22 and 12 years-old.  (R. at 330-31.)  Plaintiff does not drive or go to the grocery store; rather, her husband drives her or she takes public transit.  (R. at 30.)  Around the house Plaintiff is able to wash laundry, cook and bake sometimes, and dust, but cannot vacuum or mop the floors.  (Id.)  She enjoys embroidery, but finds that she can only concentrate on that for about one hour per day as she gets tired easily as a result of frequent auras.  (Id.)

2.   Relevant Information from Treating Physicians

For the purposes of the present Opinion, Plaintiff submitted relevant medical records from two treating physicians, Drs. Bao Nguyen and Joseph Campellone.  Although the ALJ must examine all evidence of record, treating physicians have important perspectives on claimants' impairments, as the Commissioner recognizes:

> Generally, [the Social Security Administration] give[s] more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we

> find that a treating source's opinion on the
> issue(s) of the nature and severity of your
> impairment(s) is well-supported by medically
> acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the
> other substantial evidence in your case
> record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2). Because "the ALJ must . . . pay close attention to the medical findings of a treating physician," Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986), the Court shall focus its discussion on the evidence in the record from these physicians.

a.   *Dr. Nguyen*

Dr. Nguyen is Plaintiff's treating primary care physician. (R. at 25.)  An October 1998 report to the Social Security Administration indicates that he first examined Plaintiff in 1996 and that she has a seizure disorder, but the neurology group at Cooper Hospital treats her for that condition.  (R. at 160.)  Dr. Nguyen's treating notes, which date from 1996 to April 2003, are mostly illegible.  (R. at 228-48.)  However, letters from Plaintiff's other treating physicians were addressed to Dr. Nguyen and indicate that he was kept informed by them of Plaintiff's health and treatments, for both the seizure disorder and osteoarthritis.

On February 7, 2000, Dr. Nguyen completed a residual functional capacity questionnaire form.  (R. at 198-202.)  That form indicates that Plaintiff has a history of grand mal

seizures[1] with loss of consciousness.  (R. at 198.)  However, Dr. Nguyen did not respond to the questions seeking to elicit whether the seizures were generalized or localized and with what frequency they occurred.  (R. at 198.)  Nor did he properly indicate the date of the last three seizures, indicating only that the most recent one had occurred in May 1999, some nine months earlier.  (Id.)  Dr. Nguyen indicated that Plaintiff's seizures typically last a half-hour, they don't occur at any particular time of day, and that Plaintiff always has a "warning" of an impending seizure. (R. at 198-99.)  Again, however, he failed to indicate how much time elapses between a warning and a seizure.  (R. at 199.)  Dr. Nguyen noted that Plaintiff cannot always take safety precautions when she feels that a seizure will soon occur.  (Id.)  He also indicated that there are precipitating factors for Plaintiff's seizures, but again failed to otherwise explain or to indicate the kinds of actions others should take during and immediately after Plaintiff's seizures. (Id.)  Nevertheless, Dr. Nguyen indicated that the manifestations of Plaintiff's seizures, which lasted for one hour after the

---

[1]  A grand mal seizure is a type of tonic-clonic seizure, which is "characterized by the sudden onset of tonic contraction of the muscles often associated with a cry or moan, and frequently resulting in a fall to the ground. The tonic phase of the seizure gradually give[s] way to clonic convulsive movements[, i.e., rhythmical jerking,] occurring bilaterally and synchronously before slowing and eventually stopping, followed by a variable period of unconsciousness and gradual recovery." Stedman's Medical Dictionary (27th ed. 2000) (Westlaw version).

seizures, included confusion, exhaustion, severe headaches and muscle strain.  (Id.)

He also indicated that Plaintiff is "unable to perform daily duty" following a seizure, and that she had a history of injury and of fecal or urinary incontinence during a seizure, but he failed to explain the nature of the injury, which form of incontinence she suffered, or to otherwise elaborate.  (R. at 199-200.)  Dr. Nguyen reported that Plaintiff was taking Tegretol and Neurontin to control her seizures, but failed to answer how Plaintiff was responding to that medication. (R. at 200.)  He indicated by check marks, however, that she suffered several side effects of the medication: dizziness, eye focusing problems, double vision, lethargy, lack of alertness and coordination disturbance.  (Id.)

In filling out this form, Dr. Nguyen also opined how Plaintiff's seizures might affect her ability to work.  He said that her seizures would likely disrupt co-workers and that she would need more supervision at work than an unimpaired worker; that Plaintiff could not work at heights, operate power machines that require alertness, operate a motor vehicle, or take a bus alone. (Id.)  Dr. Nguyen failed to respond to the question whether Plaintiff had any associated mental problems, including short attention span.  (Id. at 201.)  Although he indicated that Plaintiff would have to take unscheduled breaks, he failed to

10

answer when asked how often or how long such breaks would be.
Dr. Nguyen indicated that Plaintiff was incapable of even low
stress jobs, but that she would likely have good days and bad
days.  (Id.)   Nevertheless, he indicated that Plaintiff would be
"absent from work as a result of the impairments or treatment"
more than four times per month.  (Id.)   Although asked, Dr.
Nguyen did not note any other limitations that would affect
Plaintiff's ability to work, including any limits on her
abilities to sit or stand.  (Id.)

Dr. Nguyen filled out the same form in February 2004 and
indicated many of the same findings, however this time he failed
to estimate, when asked, how often Plaintiff was likely to be
absent from work based on her impairments or treatment.  (R. at
266.)

b.   *Dr. Campellone*

Neurologists at Cooper Hospital treated Plaintiff for her
seizure disorder.  Her principal physician in that group appears
to be Dr. Joseph Campellone, who first examined Plaintiff August
11, 1998.  Because Dr. Campellone is a specialist, his opinions
about the impact of epilepsy on Plaintiff are entitled to greater
weight.  20 C.F.R. § 416.927(d)(5).

The record contains Dr. Campellone's progress notes
beginning in April 1999.  (R. at 189-191.)  Although this is past
the date for which Plaintiff would have to establish disability,

his findings are relevant.  Specifically, Dr. Campellone notes that Plaintiff reported seizures and auras[2] when she was not taking the medication Neurontin, no seizures on Neurontin, but that the medication had negative side effects.  (R. at 191.)

In February 2000, Dr. Campellone wrote to Dr. Nguyen, who had referred Plaintiff, to update him on Plaintiff's treatment and health.  (R. at 220.)  Dr. Campellone indicated that Plaintiff had a normal brain MRI and EEG.  (Id.)  Dr. Campellone also noted that Plaintiff reported several auras or "spells", "consisting of a feeling of warmth and light-headedness."  (Id.) "These occur up to 3/week and last as long as 10 minutes.  She denies any generalized convulsions at all.  Today, her neurologic exam remains stable, revealing no nystagmus[3] or focal deficit." Dr. Campellone also noted that, to his knowledge Plaintiff had "no objective documentation of true convulsions."  (Id.)

---

[2]  "Epileptic ictal [(caused by seizure)] phenomenon/ phenomena perceived only by the patient."  Stedman's Medical Dictionary, supra.  For example, an "experiential aura" is an "epileptic aura characterized by altered perception of one's internal and/or external environment; may involve auditory, visual, olfactory, gustatory, somatosensory, or emotional altered perceptions. When one of the altered perceptions is clearly predominant, the specific aura classification should be used." Stedman's, supra, entry for "experiential aura."  The treating records of Dr. Campellone indicate that Plaintiff's aura's involved only nausea.  (R. at 191.)

[3]  "Involuntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component."  Stedman's.

Subsequently, Dr. Campellone examined a 72-hour EEG, which revealed no neurologic abnormalities. (R. at 217, 218.)

Dr. Campellone noted that Plaintiff reported one "mini-seizure" between May and August 2000, which did not cause her to lose consciousness. (R. at 217.) At all times while she was seeing him, it seems, "Her seizure disorder remain[ed] under control." (R. at 217.) Indeed, In August 2000, Dr. Campellone noted that it was "unclear as to what these episodes are" and that he was "suspicious they are non-epileptic in nature." (R. at 217.)

On December 8, 1999, Dr. Campellone completed a residual functional capacity questionnaire, assessing how Plaintiff's seizure disorder would affect several work-related capabilities. (R. at 192-96.) He noted that, at that time, he had seen her three times since February of 1999 and that she was diagnosed with seizure disorder and headaches. (R. at 192.) Dr. Campellone indicated that Plaintiff suffered generalized tonic clonic seizures with loss of consciousness, that she had experienced none in the past three to six months and that prior to that her seizures were only rare. (Id.) Dr. Campellone indicated that Plaintiff had experienced one seizure more than a year earlier, in November 1998, and that the dates of the prior two were unknown. (Id.) He also indicated that a typical seizure lasts "minutes." (Id.) After her seizures, according to

13

Dr. Campellone, Plaintiff suffers confusion, exhaustion, severe headache and muscle strain; he also said that Plaintiff would be "groggy and fatigued" and would therefore "be unlikely to work after a [seizure] for [the] remainder of [the] day." (R. at 193.) At that time, Plaintiff was compliant with taking her medications and did not have any side effects "as of last visit." (R. at 194.)

Dr. Campellone also indicated that Plaintiff would need more supervision at work than an unimpaired worker, could not work at heights or with power machinery, and could not operate a motor vehicle. (Id.) However, unlike Dr. Nguyen, Dr. Campellone thought that Plaintiff could take a bus alone. (Id.) When asked whether Plaintiff had any "associated mental problems" including short attention span, Dr. Campellone answered "no." (R. at 195.) He indicated that Plaintiff would "rarely" need to take unscheduled breaks, each for less than a half-hour, in an 8-hour work day. (Id.) He thought that she was capable of low stress jobs, would have good days and bad days, but would be absent from work about twice a month because of her impairment or treatments. (Id.)

Two months earlier, in October 1999, Dr. Campellone had filled out a physical functional capacity form, indicating his opinion of Plaintiff's physical capabilities. (R. at 184-88.) Dr. Campellone reported that Plaintiff could occasionally lift

and/or carry 20 pounds; frequently lift and/or carry ten pounds;
could sit, stand and/or walk about six hours in an eight-hour
workday; had no limitations on her ability to push and pull; but
could never climb ramps, stairs, rope, scaffolds or ladders and
could not balance because of the effects of her anticonvulsant
medication, "which may cause ataxia[4] as side-effect.  Patient to
avoid precarious positions where loss of balance may result in
injury."  (R. at 186.)  Dr. Campellone indicated that Plaintiff
had no manual, visual or communicative limitations, but that she
should avoid concentrated exposure to extreme temperature,
wetness, humidity, noise and vibration, should avoid moderate
exposure to fumes and odors, and should avoid any exposure to
hazards such as machinery and heights.  (R. at 187-88).  Dr.
Campellone indicated that extreme environmental conditions can
exacerbate epilepsy "in some patients" and that the possibility
of a seizure made exposure to machinery and heights unsafe.  (R.
at 188.)

          c.   *Evidence of Osteoarthritis*

     The record also contains information about Plaintiff's
treatment for osteoarthritis. There is no real dispute about the
impact of osteoarthritis on Plaintiff's residual functional

---

     [4]  "An inability to coordinate muscle activity during
voluntary movement; most often due to disorders of the cerebellum
or the posterior columns of the spinal cord; may involve the
limbs, head, or trunk."  Stedman's, supra.

capacity.  Nor is her arthritis apparently relevant to the issue that is in dispute, whether the ALJ addressed Plaintiff's purported need to miss work frequently on account of her seizure disorder; therefore, the Court will only briefly characterize this evidence.

The record contains reports from rheumatologist Dr. Juliet Coquia that span from May 2001 to December 10, 2003.  (R. at 251-55, 260-61.)  Apparently Plaintiff had surgery on her left knee sometime before December 2003 and was receiving continuing care for degenerative joint disease.  (R. at 260.)  Dr. Coquia noted that Plaintiff was doing "quite well" after a procedure to remove fluid from her right knee and injection of steroid into that knee.  (Id.)

On physical examination of Plaintiff, Dr. Coquia found that she had "good range of motion without crepitus[5], deformity or synovitis[6] of both upper extremities;" that she had a good range of motion in both hips without tenderness; that there was no evidence of right knee effusion[7]; that the left knee had

---

[5]  "Noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions."  Stedman's, entry for "crepitation".

[6]  "Inflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis."  Stedman's.

[7]  In other words, there was no increased fluid in the joint.  See "joint effusion" entry in Stedman's.

significant crepitus without effusion; that Plaintiff is flat-footed on the right side and has subtalar[8] subluxation[9] on plaintiff's right ankle; and that Plaintiff's right leg is one inch shorter than her left. (R. at 260-61.)  Dr. Coquia's report continued:

> I suspect the left ankle pain is secondary to severe [flat foot] and shorter leg creating a more functional deficit.  She may benefit by seeing her podiatrist and being prescribed new orthotics.  Because she had significant benefit form the corticosteroid injection of the right knee on last visit, we will giver her a corticosteroid injection of the left knee.  In the future she may benefit from viscosupplementation and we will address this issue with her during the next visit.

(R. at 261.)  Dr. Coquia indicated that Plaintiff's arthritis did not significantly limit Plaintiff's functionality: although Plaintiff reported significant left knee pain, Plaintiff also said she had no locking or giving way in her knees and is able to stand for two hours at a time and walk fourteen blocks "without difficulty."  (R. at 260.)

## II.  DISCUSSION

### A.  Disability Defined

---

[8]   "a plane synovial joint between the inferior surface of the talus and the posterior articular surface of the calcaneus. The term is also used clinically to refer to the compound joint formed by the talocalcaneal and talocalcaneonavicular joints." See note to "surface" in Stedman's.

[9]   A dislocation such that "though a relationship is altered, contact between joint surfaces remains."   Stedman's.

The Social Security Act defines "disability," for purposes of an individual's entitlement to benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled,

> only if his physical or mental impairment or
> impairments are of such severity that he is
> not only unable to do his previous work but
> cannot, considering his age, education, and
> work experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy
> exists for him, or whether he would be hired
> if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Substantial gainful activity is "work that - (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  This definition presupposes a regular, continuing, and sustained ability to perform such work.  Kangas v. Bowen, 823 F.2d 775, 778 (3d Cir. 1987).

The Commissioner has promulgated regulations that determine disability by application of a five-step sequential analysis codified in 20 C.F.R. § 404.1520.  The Commissioner evaluates

18

each case, step-by-step, until a finding of "disabled" or "not disabled" is obtained, 20 C.F.R. § 404.1520(a), summarized as follows:

> 1. If the claimant currently is engaged in substantial gainful employment, the claimant is "not disabled."
>
> 2. If the claimant does not suffer from a "severe impairment," the claimant is "not disabled."
>
> 3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant is "disabled."
>
> 4. If the claimant can still perform work the claimant has done in the past ("past relevant work"), despite the severe impairment, the claimant is "not disabled."
>
> 5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If the claimant is incapable, a finding of disability will be entered. On the other hand, if the claimant can perform other work, the claimant will be found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

   This analysis involves a shifting burden of proof.  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a

19

preponderance of the evidence.  In the final step, however, the Commissioner bears the burden of proving that work is available for the petitioner: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas, 823 F.2d at 777

### B.   Standard of Review

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924 (1993). "Substantial evidence" means more than "a mere scintilla."  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971).  The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Thus, substantial evidence may be slightly less than a preponderance. Hanusiewicz v. Bowen, 678 F. Supp. 474, 476 (D.N.J. 1988).

The reviewing court, however, has a duty to review the evidence in its totality. Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  "[A] court must 'take into account whatever in the record fairly detracts from its weight.'"  Willbanks v. Sec'y of

Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 95 L. Ed. 456,

71 S. Ct. 456 (1951)).  The Commissioner has a corresponding duty

to facilitate the court's review: "where the [Commissioner] is

faced with conflicting evidence, [the Commissioner] must

adequately explain in the record [the] reasons for rejecting or

discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp.

273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d

581 (3d Cir. 1986)).   In addition, some types of evidence will

not be "substantial." For example,

> [a] single piece of evidence will not satisfy
> the substantiality test if the [Commissioner]
> ignores, or fails to resolve, a conflict
> created by countervailing evidence. Nor is
> evidence substantial if it is overwhelmed by
> other evidence - particularly certain types
> of evidence (e.g. that offered by treating
> physicians) - or if it really constitutes not
> evidence but mere conclusion.

Wallace, 722 F.2d at 1153 (citing Kent v. Schweiker, 710 F.2d

110, 114 (3d Cir. 1983)). Nevertheless, the District Court is not

"empowered to weigh the evidence or substitute its conclusions

for those of the fact-finder."  Williams, 970 F.2d at 1182.

**C.   No Jurisdiction Over Decision Not to Open**

In addition to challenging the Commissioner's decision to

deny her SSI benefits, Plaintiff seeks to challenge the

Commissioner's decision not to reopen an earlier application for

SSI and Disability Insurance benefits.  The Court lacks jurisdiction to hear that challenge, as explained below.

Judicial review of the decisions of the Social Security Administration is provided for, and limited by, Sections 205(g) and (h) of the Act:

> (g) Judicial review
>
> Any individual, <u>after any final decision of the Commissioner of Social Security made after a hearing to which he was a party,</u> irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business . . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .
>
> (h) Finality of Commissioner's decision
>
> The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. <u>No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided</u>.

42 U.S.C. §§ 405(g), (h) (emphases added).

22

There is no final decision after a hearing on Plaintiff's earlier applications for benefits because she did not request one.

> It is well settled that federal courts lack jurisdiction under § 205 to review the Commissioner's discretionary decision to decline to reopen a prior application or to deny a subsequent application on res judicata grounds. See Sanders, 430 U.S. [99,] 107-09 [(1977)]; Stauffer v. Califano, 693 F.2d 306, 307 (3d Cir. 1982).  As the Supreme Court explained in Sanders, because an administrative decision declining to reopen a prior claim or denying a subsequent claim on res judicata grounds does not require a hearing, it is not a "final decision ... made after a hearing" as required for jurisdiction under § 205(g) of the Act.  See Sanders, 430 U.S. at 107-08.

Tobak v. Apfel, 195 F.3d 183, 187 (3d Cir. 1999).

ALJ Barrett explicitly declined to reopen the earlier applications.  (R. at 21) ("there are no grounds upon which the earlier determinations may be reopened").  Because Plaintiff did not seek a hearing on her prior applications, and because the Commissioner did not reopen those applications, even de facto[10], the Court cannot review the propriety of those earlier denials.

## III. ANALYSIS

---

[10]  In discussing Plaintiff's current application for SSI benefits, the ALJ carefully noted, "[a]ny reference to evidence prior to [the date of application for these benefits] is solely for purposes of determining the impact of the claimant's past condition on her current level of functioning."  (R. at 22.)

The Court must uphold the decision of the Commissioner if the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence.  Plaintiff argues that the Court should overturn the ALJ's decision because he failed to weigh all the medical evidence of record, failed to give the appropriate weight to the evidence provided by Plaintiff's treating physicians, improperly discounted Plaintiff's testimony about her limitations, failed to properly determine her residual functional capacity, and abused his discretion by failing to obtain Plaintiff's prior application folder and older medical evidence.  Because the Court agrees that the ALJ failed to address evidence from treating physicians, the Court shall remand this matter to allow the Commissioner an opportunity to make additional findings or to explain its ruling.

### A.   ALJ's Refusal to Subpoena Old Medical Evidence

Plaintiff argues that the ALJ abused his discretion in failing to issue subpoenas to obtain Plaintiff's medical records from the early 1990's.[11]  First, the Court must note that it does not review decisions of the ALJ for abuse of discretion, but rather to determine whether they are supported by substantial

---

[11]  Although the Court shall briefly address this point, the Court notes that the majority of the Plaintiff's argument purportedly on this topic actually relates to her failed attempt to reopen her prior applications.  As noted above, the Court does not have jurisdiction to address the ALJ's decision not to reopen those applications.

evidence.  Second, the Court notes that records from the early 1990's would have had little to no impact on the ALJ's determination that Plaintiff was not entitled to disability benefits, given his decision not to reopen prior applications. That is because although Plaintiff's current application for SSI includes her allegation that she has been disabled since August 1, 1991, an individual is not eligible for SSI payments for the months prior to the month in which she files her application for benefits.  20 C.F.R. § 416.335.  Plaintiff filed her application in September 1998.  Thus, the ALJ had to determine whether she was disabled at that time.  As he indicated, prior medical records were relevant to that inquiry, but his failure to subpoena unspecified records dating back beyond 1996 did not impair the ALJ's ability to analyze a complete medical history of Plaintiff's impairments as they were relevant to her current application.  The record was sufficiently developed in this case and Plaintiff was represented by counsel, thus mitigating the need for the Commissioner's aid.  Further, Plaintiff does not indicate what additional evidence might have been gathered by issuing subpoenas.

### B.  Medical Evidence of Record

Plaintiff argues that the ALJ failed to adequately address evidence from two of her treating physicians, one of whom the ALJ otherwise substantially credited.  Those physicians stated that

Plaintiff would regularly miss work each month due to her seizure disorder.  Specifically, Plaintiff alleges that the ALJ selectively referred to portions of the "Seizure Residual Functional Capacity Questionnaire" of treating neurologist Dr. Joseph V. Campellone to support the ALJ's finding that Plaintiff was not disabled, instead of considering the report as a whole. (Pl. Br. at 10.)  In portions not referenced by the ALJ, Dr. Campellone indicated that Plaintiff had good days and bad days and that her seizures or treatments would cause her to miss work about twice per month. (<u>Id.</u>; See R. at 195.)

Dr. Nguyen also completed a residual functional capacity questionnaire, indicating that Plaintiff's impairments and treatments would cause her to miss work at least four times per month.  (R. at 201.)  A vocational expert testified that missing work two or three times per month would make a non-tenured employee unemployable in the national economy.  (R. at 369-70.) The ALJ rejected that opinion as "far too speculative an opinion on which to base a disability determination," but did not otherwise address how such absences would impact employability or if/why he was rejecting that aspect of the opinions of two treating doctors.

While it is true, as the Commissioner argues, that other medical evidence in the record indicates that Plaintiff would not be absent from work every month, the ALJ's curt commentary failed

to explain how he resolved the conflict between these pieces of evidence, as this Court requires.  Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997).

> As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:
>
>> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.
>
> Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).

Schonewolf, 972 F. Supp. at 284-85.

Nor is it clear to the Court that the ALJ knew what opinion he was rejecting, because he attributed the statement to Dr. Nguyen, whose opinion he decided deserved little weight[12], but cited to the statement of Dr. Campellone, whose opinion he had decided deserved significant weight.[13]  Perhaps the ALJ

---

[12]  The ALJ "accorded less weight to this family physician's opinions, than to those of Dr. Campellone, the claimant's treating neurologist.  It is noted that Dr. Nguyen's opinions appear to be based primarily upon the subjective complaints of the claimants and not upon any objective findings."  (R. at 26.)

[13]  In fact, the ALJ specifically found that the questionnaire in which Campellone espised this opinion was entitled to "significant weight."  (R. at 26.)

27

mistakenly thought only the general physician, and not the specialist, foresaw consistent absences from work. Dr. Nguyen had indicated that Plaintiff would be absent at least four times per month, not the two Dr. Campellone predicted. The ALJ failed to address why either opinion was not credited. Further, it is unclear whether the ALJ accepted the Vocational Expert's testimony that someone who consistently misses work two to four times per month is unemployable.

The Court is aware that the ultimate determination whether a claimant is disabled is reserved to the Commissioner. However, when the ALJ declines to explain his reasons for discrediting the opinions of two treating physicians and a vocational expert, this Court cannot determine whether the decision is supported by substantial evidence. Certainly "an ALJ can reject the opinion of a treating physician if he or she explains on the record the reasons for doing so," <u>Schonewolf</u>, 972 F. Supp. at 285; however, in this case, the ALJ declined to give such an explanation.

**IV. CONCLUSION**

For the resaons explained above, the Court shall remand this matter to the Social Security Administration for further consideration of Plaintiff's claims, including whether to credit the evidence from her treating physicians who indicated that Plaintiff would consistently be absent from work, and, if not, to

explain why he was rejecting those findings.  An appropriate

Order shall be entered.


**June 25, 2007**                     **s/ Jerome B. Simandle**
Date                                   Jerome B. Simandle
                                       U.S. District Judge

29